**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL L. HAYNES, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 13 CV 50262 |
| | ) | Magistrate Judge Iain D. Johnston |
| CAROLYN COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Michael L. Haynes brings this action under 42 U.S.C. § 405(g), seeking remand

of the decision denying him social security benefits.  As explained below, the case is remanded.

**BACKGROUND**

It is fair to say that plaintiff Michael Haynes has led a dysfunctional life so far. By his

own admission, he has been arrested 50 to 60 times, has been in jail off and on for 25 years

starting when he was 14 years old, has been a gang member and hard-core drug user, and has

worked only sporadically. R. 336.

Over the years, he has applied many times for disability benefits, although the record

contains little information about these efforts. In 2006, he applied for disability benefits and was

found disabled. This was apparently his eighth application. Sometime thereafter, he began

working which led to his benefits being suspended. R. 16.

In July 2010, he filed the present application. In September 2010, he was interviewed and

evaluated by Dr. Kelly Renzi, a psychologist, who diagnosed him with mood disorder with

psychotic features and antisocial personality disorder and rated his global assessment functioning

("GAF") at 50. Ex. 5F. Her report is discussed further below.

On October 18, 2010, Dr. Elizabeth Kuester, a non-examining state consultant, completed two forms stating that plaintiff only had mild restrictions in activities of daily living and moderate difficulties in social functioning and in the area of concentration, persistence, or pace. Exs. 6F, 7F. Her assessments appear to have been based largely on Dr. Renzi's first report. R. 352. She concluded that plaintiff "could learn and perform simple, routine tasks adequately with ordinary instruction and supervision" but that he "shouldn't be required to interact extensively or deal with the public." R. 356. She further concluded that he could "relate acceptably with supervisors to the minimal and superficial extent typical of simple work" and could "make basic work decisions and cope with work demands" subject to the above limitations. *Id.*

In late December 2010, plaintiff sought counseling at the Janet Wattles Mental Health Center. Ex. 14F. He was seen by staff social workers, as well as by psychiatrist Shahina Jafry. Dr. Jafry's conclusions are discussed further below.

On February 15, 2011, plaintiff was examined a second time by Dr. Renzi who issued another report reaching similar conclusions as her first one. Ex. 12F.

In July 2011, the Janet Wattles Center terminated plaintiff's therapy because he missed several appointments. R. 429. In November 2011, plaintiff returned to Janet Wattles Center (then called Rosecrance) and began therapy again. R. 451.

On January 12, 2012, a hearing was held before an administrative law judge ("ALJ"). Plaintiff testified that he was 45 years old and had completed the 11th grade. His last job was at a pizza restaurant where he worked in 2007 and 2008. R. 32. When asked why he was not currently working, plaintiff testified: "I don't even leave my house that much unless someone's with me, sir. And I just don't – my brain just don't work like it used to." R. 34. Plaintiff estimated that he left the house two times a week. Although he played with his children, who

lived with him and his girlfriend, he otherwise only socialized with his girlfriend and two friends who would come over and occasionally take him out. When plaintiff's girlfriend was working, she arranged for one of her girlfriends to come to the house and act as a babysitter and oversee the household. R. 36 ("[the babysitter] makes us lunch, breakfast, dinner, whatever").

Plaintiff testified that his reluctance to leave the house and his general paranoia increased after an incident several years ago when he was walking with his friend on the street and someone pulled up in a car and shot and killed his friend. Because of this incident and other issues, plaintiff does not feel safe outside of the house and does not like being around people. He takes medicine for these problems. R 37-38.

Plaintiff then discussed his physical ailments, including his chronic back pain and HIV positive status, for which he takes numerous medications that his girlfriend helps manage. He wears a mask in the house to keep his children from getting sick from his frequent colds. R. 38. Because these physical issues are not at issue in appeal, the Court will not discuss them further.

On March 22, 2012, the ALJ issued his opinion. The ALJ found that plaintiff had these severe impairments: bipolar disorder, personality disorder, post-traumatic stress disorder ("PTSD"), and a L5-S1 disc protrusion with S1 nerve root displacement. R. 13. As for the Section 12 mental health listings, the ALJ found plaintiff only had a mild restriction in activities of daily living and moderate difficulties in social functioning and in concentration, persistence, or pace. R. 14-15. The ALJ found that plaintiff had the residual functional capacity ("RFC") to do light work that "stays the same day-to-day, which does not involve team coordination, frequent interaction or public contact." R. 15. The ALJ relied on Dr. Kuester's opinion in formulating this RFC. The ALJ also found plaintiff lacked credibility based on the following:

- On two occasions, plaintiff told a social worker he was interested in trying to work if he could work by himself.

- According to notes from a pain doctor (Dr. Dodaro), plaintiff stated that he was working as a self-employed contractor when in fact he was not.
- Plaintiff also told Dr. Dodaro that he did not have a history of substance abuse even though he told many other doctors that he had used drugs for many years.
- After being disabled in 2006, he started working thus showing his ability to work.
- Plaintiff denied current drug use when he saw Dr. Renzi.
- In February 2007 he told Dr. Renzi he had "last had undergone incarceration in 2006, when in fact he had been incarcerated in approximately November 2010 after getting into a fight."
- In his September 2010 interview with Dr. Renzi, plaintiff described his hallucinations as involving images of Muslim "Gens" but in November 2011 he told a Rosecrance therapist that he did not have a specific religious preference.
- In the second visit with Dr. Renzi, plaintiff "dramatically" changed his description of what he did in a typical day.
- Plaintiff told Dr. Renzi that the longest he had ever worked was "about a month in 2007 or 2008 doing maintenance" when in fact he had been doing this work for 18 months, thus creating the impression "he had virtually no employment history."
- Plaintiff told Dr. Renzi that his last job ended "because he got into a disagreement with his supervisor" but stated on an earlier form that "the work ended because he got hurt."

R. 17-18. Based on these inconsistencies, the ALJ concluded that plaintiff was not a "reliable historian" and "not able to provide accurate and specific details" and that any reliance on his recollections "only could lead to flawed conclusions." R. 17, 19. Therefore, the ALJ purported to rely on the "objective evidence" instead. *Id.* Finally, the ALJ concluded that plaintiff's past relevant work, as a janitor and forklift driver, were beyond the RFC as formulated above. Relying on the vocational expert, the ALJ concluded that plaintiff's RFC would allow him to work as a cafeteria attendant, a cleaner, and a machine feeder. R. 21-22.

## DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v.*

*Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the

decision by reconsidering facts or evidence, or by making independent credibility

determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). However, the Seventh Circuit

has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593

(7th Cir. 2002) (a "mere scintilla" is not substantial evidence). If the Commissioner's decision

lacks evidentiary support or adequate discussion, then the court must remand the matter. *Villano

v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Moreover, a reviewing court must conduct a

critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v.

Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Indeed, even when adequate record evidence exists to

support the Commissioner's decision, the decision will not be affirmed if the Commissioner does

not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*,

516 F.3d 539, 544 (7th Cir. 2008). And, as the Seventh Circuit has repeatedly held, the federal

courts cannot build the logical bridge on behalf of the ALJ. *See Jensen v. Colvin*, 2013 U.S. Dist.

LEXIS 135452, *33-34 (N.D. Ill. 2013) (collecting cases, including *Sarchet v. Chater*, 78 F.3d

305, 307 (7th Cir. 1996)).

Plaintiff raises multiple arguments in his opening brief, although most of them are cryptic

and poorly developed.[1] However, despite this fact, this Court finds that a remand is warranted

based on plaintiff's claim that the ALJ failed to adequately analyze the opinions from the treating

and examining doctors, as required by the treating physician rule and related social security

regulations. *See* 20 C.F.R. § 404.1527(c)(2); 20 C.F.R. § 404.1513. These regulations set forth a

hierarchy of medical opinion testimony for treating, examining, and non-examining physicians.

---

[1] This Court has commented previously about the bare-bones presentation of arguments from plaintiff's counsel. Although this Court did not find a waiver of all his arguments in this case, counsel's arguments dangerously skirted this line.

*Id.* In general, opinions from treating sources with treating relationships are given the most weight. 20 C.F.R. §404.1527(c)(2). Opinions from examining sources are usually given more weight than medical opinions from non-examining sources. 20 C.F.R. §404.1527(c)(1), (e). The key requirement is that the ALJ must explain what specific weight, if any, all these opinions should be given after explicitly analyzing what the Seventh Circuit refers to as "the checklist" of factors. 20 C.F.R. §404.1527(e); *Larson v. Astrue*, 615 F.3d, 744, 751 (7th Cir. 2010).

Here, the ALJ did not follow this rule. This Court begins by summarizing the evidence from Dr. Jafry, the only treating psychiatrist. On January 13, 2011, Dr. Jafry saw plaintiff in a visit that lasted 45 minutes and which appears to be the first visit. Dr. Jafry diagnosed plaintiff with bipolar disorder, dysphoria with psychotic features, PTSD, and antisocial personality disorder. R. 419. These conclusions were based on plaintiff's mood swings, impulsive behaviors, agitation, aggression, trouble with the law, flashbacks, audio and visual hallucinations, and paranoid thoughts. *Id.* Dr. Jafry prescribed Risperdal, Hydroxyzine, Tripletal, and Remeron. *Id.* She listed his GAF as 45 and stated that it was the "Highest in Past Year." Plaintiff also saw Dr. Jafry again on February 24, 2011 for a 15 minute visit where she noted that some symptoms were less frequent. R. 422-23. She saw plaintiff on May 5, 2011, also for a 15 minute visit, and noted that he still had flashbacks and hallucinations. R. 426-27.

Although the ALJ summarized some but not all of this evidence, the ALJ did not indicate what weight he was giving to Dr. Jafry's observations and diagnoses, nor engage in any meaningful analysis. The ALJ first summarized the January visit, acknowledging that Dr. Jafry "was concerned" about plaintiff's multiple symptoms, such as his aggression and hallucinations. R. 20. However, the ALJ never analyzed this evidence, other than to point to the relatively trivial point that Dr. Jafry noted that plaintiff was not currently a danger to himself or others despite

having a history of suicide attempts. *Id.* The ALJ thus did not grapple with the substance of the

report – namely, that plaintiff was diagnosed with multiple serious conditions and that he was

having hallucinations for which he was prescribed medication. The ALJ also did not comment on

the significance of Dr. Jafry's assessment of plaintiff's GAF score as 45, even though the ALJ

elsewhere in his opinion relied on other GAF scores when they were over 50.

The ALJ perhaps discounted these initial negative findings by Dr. Jafry because he

believed plaintiff's condition improved with treatment. The ALJ pointed out that Dr. Jafry after

the February visit noted that plaintiff's symptoms were "better." R. 20. The ALJ also observed—

wrongly, as it turns out—that this February visit was "the last date that [Dr. Jafry] saw

[plaintiff]." *Id.* To the extent the ALJ was relying on this improvement rationale, [2] the ALJ

failed to address several significant countervailing points. While it is true that Dr. Jafry noted

that some symptoms were better (for example, the hallucinations were fewer), Dr. Jafry

nonetheless indicated after the February visit that there was no change in diagnosis and she even

*increased* plaintiff's medication, suggesting that any improvement was marginal and that these

problems had not gone away. R. 423.[3] Moreover, the ALJ did not consider evidence from the

May 5, 2011 visit, mistakenly believing that the February visit was the last one. In her notes from

this visit, Dr. Jafry indicated, among other things, that plaintiff was still having flashbacks, visual

hallucinations about angels, paranoid thoughts about being watched, anxiety, although he was

less angry. R. 426. She indicated no change in diagnosis; the only medication change was to

switch from Risperdal to Saphris. *Id.* Additionally, although not completed by Dr. Jafry, the

---

[2] The ALJ never explicitly adopted this rationale, but it is implicit in the way the opinion is written, a conclusion supported by the government's response brief, which also interprets the ALJ as relying on an improvement rationale. *See* Dkt. # 19 at p. 9 (stating "the ALJ considered Haynes's documented improvement in mental symptoms with treatment").

[3] Specifically, Dr. Jafry increased the dosage for Risperdal (for hallucinations and irritable moods), Hydroxyzine (anxiety and sleep), and Remeron (depression). R. 423.

Janet Wattles closing report in July 2011, issued when plaintiff's therapy was terminated, stated that his current GAF was still 45 (the original number Dr. Jafry assigned to him) and noted that "[i]n the past six months [plaintiff] has made very little progress." R. 428-429. This evidence, not discussed by the ALJ, arguably casts serious doubt on the implied improvement narrative.

The Court has similar concerns with the ALJ's discussion of the two reports from Dr. Renzi who, although not a treating physician, nonetheless was an examining physician who saw plaintiff twice. The ALJ discussed these reports in multiple places and even picked out snippets from them to cast doubt on plaintiff's credibility, as discussed below. But here again, the ALJ did not indicate what weight was given to these reports, nor did the ALJ really address the substance of them other than to merely summarize parts of them. This evidence was not trivial. Similar to Dr. Jafry, Dr. Renzi diagnosed plaintiff with a mood disorder with psychotic features as well as antisocial personality disorder. She recounted his history of arrests and incarcerations, noting that he was put in juvenile detention from age 14 and a half, was arrested between 50 to 60 times, spent a total of 25 years in prison, tried to stab a guard in prison and was put into segregation where he "lost [his] mind" and tried to hang himself. He also reported using cocaine, heroin, and PCP. R. 336. Dr. Renzi in her reports never questioned the accuracy of this history as recounted to her by plaintiff.

Because the ALJ did not analyze this evidence, this Court cannot determine whether the ALJ credited this evidence but found it not persuasive enough or instead discounted it for some unstated reason. The only part of these reports that the ALJ specifically addressed was Dr. Renzi's GAF assessment in February 2011. The ALJ stated: "[Dr. Renzi] assigned a GAF of 45, signifying marked restriction, which the undersigned will discount as inconsistent with the signs and findings preceding this date, and the fact that claimant specifically indicated work

willingness in December 2010 and November 2011[.]" R. 20. Without further explanation, this Court cannot meaningfully assess this conclusory assertion, especially given that Dr. Jafry just a month before also rated plaintiff's GAF at 45. How then is this GAF score from Dr. Renzi inconsistent? What specific evidence is the ALJ referring to? The ALJ did not explain. Instead, the ALJ implicitly credited the opinion of Dr. Kuester, the non-examining doctor, over that of Dr. Renzi and Dr. Jafry without explaining why he did so or, alternatively, explaining why he felt all these opinions could be interpreted as being consistent with each other. *See Czarnecki v. Colvin*, 595 Fed. Appx. 635, 642 (7th Cir. 2015) (remanding case: "The ALJ also credited, without explanation, the opinions of the two state-agency reviewing psychologists over that of Dr. Wagner, the state-agency psychologist who personally evaluated Czarnecki in 2010, diagnosed her with major depressive disorder and panic disorder, and rated her GAF at 40."); *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014) (remanding case: "The problem in this case is that the ALJ did not provide a valid explanation for preferring the record reviewer's analysis over that of the agency's examining doctor.").

In addition to the doctors, there were several therapists who treated plaintiff and specifically assessed his GAF score. For example, in November 2011, several therapists at Rosecrance rated plaintiff's GAF score in the high 40s, one giving him a 48 and another a 45. R. 471, 478. However, the ALJ did not acknowledge the latter score and rejected the former score "because it was not assigned by an acceptable medical source and because it is inconsistent with the objective signs and findings of [the] mental status examination." R. 21. As the Seventh Circuit has noted, an ALJ may not reject an opinion by a nurse practitioner simply because she is not an acceptable medical source. *See Voigt v. Colvin*, 781 F.3d 871, 878 (7th Cir. 2015) (citing 20 C.F.R. §§ 404.1513). The ALJ's treatment of this evidence is also inconsistent with the fact

that the ALJ, elsewhere in the opinion, relied on GAF scores assigned by non-acceptable medical

sources when those scores were over 50, which the ALJ interpreted as supporting his finding that

plaintiff only had moderate, rather than marked, limitations. *See* R. 19 ("[a] GAF of 51 was

assigned, again signifying *only* moderate functional impact") (emphasis added); *see generally*

*Voigt*, 781 F.3d at 874 ("a [GAF] score of between 41 and 50 signifies serious psychiatric

illness"). Whatever merit GAF scores may have in general, which is a subject of some debate

(*see id.*), the ALJ may not rely on certain GAF scores, but then he fail to consider all such scores

in an equal or fair way without at least offering an explanation for such differential treatment.

The Seventh Circuit has held that this type of cherry-picking justifies a remand. *See Yurt v.*

*Colvin*, 758 F.3d 850, 859 (7th Cir. 2014) (it is improper for the ALJ to "seize upon" a GAF

"high-water" mark of 60 while ignoring other lower scores); *Walters v. Astrue*, 444 Fed. Appx.

913, 919-20 (7th Cir. 2011) (remanding because ALJ "certainly thought GAF scores important,

as he cited the high GAF scores" from certain doctors while ignoring a lower score of 45 -- "[i]f

accepted, a GAF of 45 suggests that [the plaintiff] may be unable to work").

      The Court finds that the above issues require a remand. In addition, after reading the

ALJ's opinion and reviewing the record, the Court has several concerns about the ALJ's

credibility findings.[4] First, as a general point, although the ALJ purported to base his decision

solely on the objective evidence because plaintiff was an "unreliable historian," the ALJ

nonetheless relied on plaintiff's statements repeatedly when they supported the ALJ's view of

the case. For example, the ALJ accepted at face-value several anodyne statements (such as "I'm

---

[4] An ALJ's credibility determination should be reversed only if it is patently wrong.
*Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015). However, an ALJ's decision may be
reversed if the ALJ "fail[s] to adequately explain his or her credibility finding by discussing
specific reasons supported by the record." *Id.*; *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008)
(a credibility finding "must be specific enough to enable the claimant and a reviewing body to
understand the reasoning").

a good dad," "I'm a fast learner," and "I'm a hard worker") that plaintiff made to the therapists

when specifically asked to identify his strengths. R. 18, 376, 451. From these bland and general

statements, the ALJ extrapolated that plaintiff, in fact, had the mental and physical abilities to be,

for example, a hard worker. This does not automatically follow, and it seems unduly harsh to

penalize plaintiff for trying to identify—and perhaps aspire towards—various positive traits.

Similarly, the ALJ's analysis of the four paragraph B criteria rested on only two documents (Exs.

4E and 8E), both of which are forms plaintiff completed. Therefore, this portion of the decision

assumed that plaintiff was an accurate historian.[5] The larger issue is that, although the ALJ

pointed to many little inconsistencies, the ALJ offered no consistent rationale for why plaintiff

would exaggerate or lie in certain statements and not in the others on which the ALJ relied on.  It

would not be unreasonable to conclude that a person like plaintiff, who all doctors agree was

experiencing hallucinations and paranoid thoughts, might be unable to accurately self-assess

whether he could work on a consistent basis.

Second, in several places, the ALJ based his credibility finding on a mistake of fact,

which is a ground for remand. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014)

(remanding because the ALJ's credibility determination "misstated some important evidence and

misunderstood the import of other evidence"); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir.

2006) (an ALJ may not base a credibility determination on "errors of fact or logic"). One notable

example is the ALJ's assertion that plaintiff "dramatically" changed his story between the first

visit and second visits to Dr. Renzi. This conclusion was based on the ALJ's belief that plaintiff

---

[5] And even here, the ALJ selectively quoted from the two forms. For instance, the ALJ concluded that plaintiff only had mild limitations in activities of daily living because (among other things) he takes care of his young children.  R. 14. However, the only evidence in these two exhibits arguably supporting this assertion is this statement:  "I get up[,] feed the kids & watch them play in [the] yard [and the] girlfriend comes over [and] does laundry, dishes and cleans." R. 194. Watching your kids play seems to fall well short of meaningfully taking care of them.

claimed in his first visit to Dr. Renzi that *he* was then doing the majority of the household work such as cooking, cleaning, and laundry but then in the second visit claimed that "the family now had a live-in babysitter and his involvement mainly was limited to play." R. 18. The ALJ found it suspicious that plaintiff's condition would have deteriorated so rapidly in the four and a half month interval between visits (which the ALJ mistakenly thought was seven months). The problem is that Dr. Renzi's report clearly states that in the first visit plaintiff stated that it was his *girlfriend* (not him) who did the majority of the housework. Thus, there is no inconsistency on this point, a conclusion supported by the fact that Dr. Renzi never noted any contradiction.

Another factual mistake relates to the ALJ's conclusion that plaintiff only had moderate limitations in the concentration, persistence, or pace. The ALJ noted: "Despite allegations of a short attention span and problems focusing, the claimant is able to follow the plot of television shows and movies, is able to handle his own finances, and cares for his own children." R. 15. The claim that he could follow the plot of television shows is not supported by any evidence in the record insofar as this Court can tell. In fact, at the hearing the plaintiff testified to just the opposite. R. 46 ("I'll watch cartoons with all of my kids. That's about it."). And the ALJ's hypothetical questions to the vocational expert seemed to accept this testimony. R. 50 (ALJ stating "he watches TV, but does not follow the plot"). So, it appears that the ALJ again was confused and mistakenly reached the opposite conclusion to the one supported by the evidence.

Having found that a remand is warranted on the above grounds, this Court need not address plaintiff's argument that the hypothetical questions to the vocational expert failed to incorporate all his limitations. On remand, the ALJ will first have to re-consider the RFC analysis which in turn may affect what questions are posed to the vocational expert. Nor does

the Court need to address plaintiff's argument that the ALJ should have called a medical expert, as this issue should be left to the ALJ's discretion on remand.

**CONCLUSION**

This opinion should in no way be interpreted as indicating that the Court believes plaintiff is entitled to benefits. He may be; he may not be. Based upon its independent review of the entire record, the Court understands how a reasonable ALJ may ultimately conclude that plaintiff is not entitled to benefits based, in part, on plaintiff's lack of credibility. However, numerous Seventh Circuit cases direct the district courts to not only consider the ALJ's ultimate determination, but also the ALJ's legal analysis in reaching the determination. *See, e.g., Sarchet*, 78 F.3d at 307 ("[W]e cannot uphold a decision by an administrative agency . . . if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."). In the Seventh Circuit, in reviewing Social Security disability decisions, the journey is as important as the destination. In this case, the ALJ's analysis is riddled with significant errors, both legal (such as failing to properly apply the treating-physician rule) and factual (such as, but certainly not limited to, the mistaken finding that plaintiff dramatically changed certain representations). Consequently, the Court must remand the case.

For these reasons, plaintiff's motion for summary judgment is granted; the government's motion is denied, and the case is remanded to the Commissioner for further proceedings.

Date: June 1, 2015                    By:    _____
                                             Iain D. Johnston
                                             United States Magistrate Judge